**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HANS FUTTERMAN, | : | Case No. 17-12899 (MEW) |
| | : | |
|           Debtor. | : | |

------------------------------------------------------------x
| | | |
|---|---|---|
| USHA SOHA TERRACE, LLC., | : | |
| | : | |
|           Petitioner, | : | |
| | : | |
|       -against- | : | Adv. Pro. No. 17-01220 (MEW) |
| | : | |
| RGS HOLDING, LLC, HANS FUTTERMAN, | : | |
| SOHA TERRACE, LLC, 2280 FDB, LLC, | : | |
| | : | |
|           Respondents. | : | |

------------------------------------------------------------x
| | | |
|---|---|---|
| USHA SOHA TERRACE, LLC., | : | |
| | : | |
|           Plaintiff, | : | |
| | : | |
|       -against- | : | Adv. Pro. No. 17-01221 (MEW) |
| | : | |
| RGS HOLDING, LLC, HANS FUTTERMAN, | : | |
| SOHA TERRACE, LLC, 2280 FDB, LLC, | : | |
| | : | |
|           Defendants. | : | |

------------------------------------------------------------x
| | | |
|---|---|---|
| 2280 FDB, LLC and SOHA TERRACE, LLC., | : | |
| | : | |
|           Plaintiffs, | : | |
| | : | |
|       -against- | : | Adv. Pro. No. 17-01222 (MEW) |
| | : | |
| RGS HOLDING, LLC, SOHA MANAGER | : | |
| OWNER, LLC, HANS FUTTERMAN, SOHA | : | |
| TERRACE MANAGER CORP., ABC CORP., | : | |
| and XYZ, L.L.L, | : | |
| | : | |
|           Defendants. | : | |

------------------------------------------------------------x

```
-----------------------------------------------------------------x
RWNIH-DL 122nd STREET 1 LLC,              :
                                          :
                    Plaintiff,            :
                                          :
        -against-                         :          Adv. Pro. No. 17-01223 (MEW)
                                          :
HANS FUTTERMAN,                           :
                                          :
                    Defendant.            :
-----------------------------------------------------------------x
```

### BENCH DECISION REGARDING MOTION TO APPOINT CHAPTER 11 TRUSTEE, MOTIONS REGARDING CONFIRMATION OF ARBITRATION AWARD AND MOTION FOR APPOINTMENT OF AN INDEPENDENT <u>MANAGER OR RECEIVER FOR CERTAIN ENTITIES</u>

A P P E A R A N C E S :

For Debtor:
    TARTER KRINSKY & DROGIN LLP
        1350 Broadway
        New York, NY 10018
            BY:    SCOTT S. MARKOWITZ, ESQ.
                   ROBERT A. WOLF, ESQ.

For RWNIH-DL 122nd Street 1 LLC:
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
        1177 Avenue of the Americas
        New York, NY 10036
            BY:    P. BRADLEY ONEILL, ESQ.
                   ADAM C. ROGOFF, ESQ.

For USHA SoHa Terrace, LLC:
    RICHARD L. YELLEN & ASSOCIATES, LLP
        111 Broadway
        11th Floor
        New York, NY 10006
            BY:    BRENDAN C. KOMBOL, ESQ.

For Ventures SoHa LLC:
    OLSHAN FROME WOLOSKY
        1325 Avenue of the Americas
        New York, NY 10019
            BY:    ADAM H. FRIEDMAN, ESQ.

For Office of the United States Trustee:
    OFFICE OF THE UNITED STATES TRUSTEE
       201 Varick Street0020
       Room 1006
       New York, NY 10014
         BY:    BRIAN S. MASUMOTO, ESQ.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE:**

Before the Court are a number of motions made in connection with the Chapter 11 case of debtor Hans Futterman, and also in connection with a number of adversary proceedings that were originally filed in the New York State court but that have been removed to this court.

As background: the debtor, Mr. Futterman, is a real estate developer. He has owned or controlled a number of other entities that have engaged in development projects or that own land that is subject to future development. The main projects in which Mr. Futterman has been involved, and the entities that are relevant to them, are the following.

First, Mr. Futterman was involved in a project that I will refer to here as the Ladera project. More particularly, Mr. Futterman was the owner of one hundred percent of the interests in an entity known as Ladera Parent LLC, a New York limited liability company. Ladera Parent LLC, in turn, was the owner of one hundred percent of the limited liability company membership interests in Ladera, LLC, which is also a New York limited liability company. Ladera, LLC owned real property at 300 West 122nd Street in New York that it hoped to develop. It borrowed money from a lender named RWNIH-DL 122nd Street 1 LLC, which for obvious reasons I will shorten and will refer to here as RWN.

Things did not go as hoped, and the Ladera entities filed Chapter 11 bankruptcy cases in this court that were assigned to me. After much back and forth, the debtors and RWN submitted competing plans of reorganization. By agreement of the parties, I confirmed a plan that would

3

have permitted the Ladera entities to refinance their debts, but that included a deadline for doing

so, with the understanding that, if the relevant financing was not accomplished by the drop-dead

date, the lender's plan would then be confirmed.  The Ladera entities did not complete their

proposed transaction by the relevant deadline, and their plan therefore did not become effective.

At that point, the prior confirmation order was negated and the RWN plan was confirmed.

Pursuant to the RWN plan, an auction sale was held in September 2017, at which time

RWN made a credit bid in the amount of $48,600,000 plus the assumption of certain other

obligations.  This Court approved the sale of the property to RWN or its designee by order dated

September 22, 2017.

Mr. Futterman was a guarantor of the obligations that the Ladera entities owed to RWN.

RWN filed suit in the New York state court to collect on that guarantee, and that lawsuit has

been removed to this court.  RWN has also filed a proof of claim in Mr. Futterman's chapter 11

case, to which Mr. Futterman has objected.  I have consolidated, or will consolidate, those

matters for purposes of pre-trial proceedings and trial.

Second, Mr. Futterman and his entities have had roles in the development of real property

located at 2280 Frederick Douglass Boulevard in Manhattan.  There are a number of entities

involved in that project, and I will first clarify who they are.

The main operating entity, which still owns some unsold condominium units in

the 2280 property, is a limited liability company named 2280 FDB, LLC.  I will refer to it as

2280 or 2280 FDB.  2280 FDB is a New York limited liability company.  There are two entities

that have ownership interests in 2280 FDB.  One is a limited liability company named SoHa

Terrace, LLC, which is a New York limited liability company.  I will refer to it as SoHa Terrace.

4

SoHa Terrace owns all of the Class A membership interests in 2280, which represent 99.5 percent of the membership interests in 2280.

The other member of 2280 FDB is SoHa Terrace Manager Corporation, which has a .5 percent ownership interest and which is the managing member of 2280 FDB. SoHa Terrace Manager Corporation owns all of the Class B membership interests. SoHa Terrace Manager Corporation is one hundred percent owned by an entity called SoHa Manager Owner LLC. I will refer to it as SMO. Mr. Futterman owns one hundred percent of the interests in SMO.

As I mentioned, SoHa Terrace, LLC owns 99.5 percent of the ownership interests in 2280 FDB. SoHa Terrace, in turn, has three owners: RGS Holdings, LLC is an eighty-percent owner; USHA SoHa Terrace, LLC, which I will refer to as USHA, is a fourteen-percent owner; and Ventures Soha LLC, which I will refer to as Ventures, is a six-percent owner.

Mr. Futterman is the one-hundred-percent owner of RGS Holdings, LLC, which I will refer to as RGS. RGS is a Delaware limited liability company. RGS is named as the managing member of SoHa Terrace in the SoHa Terrace operating agreement, but that is an issue that is subject to an arbitration decision that I will describe in a few minutes.

The various entities involved in the 2280 project, and some of their other owners, were engaged in a number of litigations over that project and over the operations of the relevant companies. Some of that litigation resulted in an arbitration proceeding and in a decision and award dated July 12, 2017 that has been submitted as an exhibit in these proceedings. I will describe the arbitrator's ruling more completely in a few minutes.

The relevant state court lawsuits that gave rise to the arbitration had been removed to this court, and some of the motions pending before me have to do with the extent to which I should or should not confirm the arbitrator's decision and award.

5

In addition, RWN claims that it is the beneficiary of pledges of any proceeds that RGS, Mr. Futterman, and/or SMO receive from their direct and indirect interests in 2280 FDB.

Third, Mr. Futterman also has a one-hundred-percent ownership interest in an entity known as Jenco 121 LLC. I will refer to this entity as Jenco. Jenco is a New York limited liability company. It owns a vacant lot at 311 West 121st Street in Manhattan. Jenco is a guarantor of the obligations owed to RWN and has pledged assets in support of that guarantee.

Mr. Futterman also owns other properties, many or all of which are owned jointly with his wife, but the details are not important to the decisions to be made today.

As a result of all of the foregoing, I now have a number of matters pending before me. First, RWN has moved for the appointment of a chapter 11 Trustee. The matter has been fully briefed and was the subject of an evidentiary hearing that began on April 20th, 2018. No testimony was offered, but twenty-seven exhibits were offered into evidence without objection. Additional exhibits were received today in the form of the various LLC agreements, as I have mentioned at the outset of the hearing on this matter today.

Second, as noted above, the parties to the 2280 arbitration proceeding have made motions either to confirm the arbitrator's decision and award in its entirety, or in the case of Mr. Futterman and his entities, to confirm it only in part. The differences between the parties relate to provisions in the arbitrator's award that found that Mr. Futterman and his entities had violated fiduciary duties owed to the other investors in the 2280 project and that barred Mr. Futterman from exercising management control.

In paragraph 1 of the award, the arbitrator stated that RGS, Mr. Futterman and their affiliates, including SoHa Terrace Manager Corp. and SMO, are "herein and hereby removed from all management or control over SOHA Terrace, LLC and 2280 FDB, LLC due to the

intentional misconduct of Hans Futterman through RGS Holdings, LLC and/or SoHa Terrace

Manager Corp." In paragraph 2 of the award, the arbitrator stated that "USHA SOHA Terrace

LLC, shall elect new managing members for SOHA Terrace, LLC and 2280 FDB, LLC."

Mr. Futterman contends that the arbitrator exceeded his authority by allowing the holder of a

minority interest in SoHa Terrace to elect the new managers of both SoHa Terrace and

2280 FDB. He has also asked that I appoint an independent manager or trustee to take over the

affairs of each of those entities.

At my request, on April 20th, the parties have submitted additional briefs concerning the

extent to which I would have authority under section 703 of the New York Limited Liability

Company Law to appoint a liquidating trustee or receiver for either 2280 FDB and/or for SoHa

Terrace.

In addition, since the parties' arguments have relied heavily on the terms of the

underlying limited liability company agreements, those agreements have been submitted to the

Court and have been marked as Exhibits B through J for purposes of my rulings today.

Finally, as I mentioned before, the objections to the RWN deficiency and guarantee

claims are pending before this Court. They are not ready for resolution on the merits, but

discovery has been proceeding.

Turning to the trustee motion: Mr. Futterman contends that I should defer consideration

of the RWN motion for appointment of a trustee until after I decide, on the merits, whether RWN

actually owns a guarantee claim against Mr. Futterman. He contends that if the deficiency claim

is defeated, then RWN would no longer be a party in interest who would have standing to seek

the appointment of a trustee.

However, section 1104 of the Bankruptcy Code provides that a request for appointment of a trustee may be made by any party in interest. The term "party in interest" is not defined in the Bankruptcy Code, but there is nothing in the way that term is used in the Bankruptcy Code that suggests that it is limited to persons who hold undisputed claims. Instead, in those instances where Congress wished to limit the standing of creditors to those who hold undisputed claims, Congress was quite clear about it. For example, the Bankruptcy Code provides that holders of disputed claims do not have standing to commence involuntary bankruptcy cases. *See* 11 U.S.C. § 303(b)(1). No such limitation appears in section 1104 of the Bankruptcy Code with respect to requests by parties in interest for the appointment of a trustee.

The debtor urges me to hold that the RWN claim is so obviously devoid of merit that it does not confer standing to make the trustee request. I need not decide whether that is a power that a court might have in connection with a request under section 1104, because it is not at all clear to me at this stage that the RWN claim is obviously devoid of merit. Mr. Futterman has raised significant factual issues about that claim, and procedural issues about the way the auction was conducted, and questions as to whether the auction results reflected the real values of the underlying properties. I do not mean to minimize the seriousness of those questions. However, further discovery and further proceedings are needed to resolve those questions, and in the meantime, RWN is a party in interest.

I also note that the trustee motion raises issues as to whether Mr. Futterman should be entrusted with the fiduciary obligations of controlling this estate. Some of the contentions and findings of the arbitrator are matters that if accepted would require the appointment of a trustee under the terms of section 1104 of the Bankruptcy Code. These allegations raise serious issues

that potentially affect all parties in interest and that should not be deferred until after the issues

relating to RWN's claim are resolved.

As to the merits of the request: Chapter 11 of the Bankruptcy Code is designed in the

ordinary case to permit a debtor to remain in possession of management and control of the

debtor's businesses and properties.  However, section 1104(a) of the Bankruptcy Code provides

that a debtor may be deprived of such control and that a trustee should be appointed or must be

appointed under certain circumstances.

First, section 1104(a)(1) provides that a trustee shall be appointed "for cause, including

fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current

management, either before or after the commencement of the case, or similar cause."

Section 1104(a)(1) refers to fraud or mismanagement in connection with the affairs of the debtor,

but also requires the appointment of a trustee for "similar cause."  Courts have held that the

particular items listed in 1104(a)(1) are not exclusive and that factors that may constitute cause

for the appointment of a trustee include inappropriate relations between corporate parents and

subsidiaries, misuse of assets and funds, inadequate record-keeping and reporting, and various

instances of conduct found to establish fraud or dishonesty, lack of credibility, and lack of

creditor confidence.  *See In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn. 1999), *vacated in part

on other grounds*, 254 B.R. 509 (D. Conn. July 27, 2000).

Once a court finds that cause exists, the court has no discretion.  A trustee must be

appointed.  The party who seeks the appointment of a trustee has the burden of showing by clear

and convincing evidence that cause exists under section 1104(a)(1).  *See In re Ashley River

Consulting, LLC*, No. 14-13406, 2015 Bankr. LEXIS 1008, at *28 (Bankr. S.D.N.Y.

March 31, 2015).  However, a court has wide latitude in determining whether conduct, once

proved, rises to the level of cause for the appointment of a trustee.  *Id*. at 29.

Second, even if cause does not exist under section 1104(a)(1), a court may appoint a

trustee pursuant to section 1104(a)(2) of the Bankruptcy Code if "such appointment is in the

interests of creditors, any equity security holders, and other interests of the estate."  Factors to be

considered by the court in considering a request under section 1104(a)(2) include the

trustworthiness of the debtor, the debtor's past and present performance and prospects for

rehabilitation, the confidence or lack thereof of the business community and of creditors in

present management, and the benefits derived from the appointment of a trustee balanced against

the cost of the appointment.  *See In re 1031 Tax Group, LLC*, 374 B.R. 78, 91 (Bankr. S.D.N.Y

2007).

In this case, RWN has relied on both sections 1104(a)(1) and 1104(a)(2) in its papers,

though at the April 20 hearing it appeared that RWN relied primarily on section 1104(a)(2).  In

connection with its motion, RWN primarily relies on certain findings made by the arbitrator in

the proceedings I described above.  The arbitration resolved a number of disputes with respect to

the development of the 2280 property and the operation of the relevant entities, including

allegations of fraud, deceit, breach of fiduciary duty, mismanagement, and/or failure to keep

accurate books and records.  The decision was submitted as Exhibit 7, and I have reviewed it

very carefully.

The arbitrator resolved disputes between the parties as to amounts that were owed to

Mr. Futterman's companies as development or management fees.  However, the arbitrator

rejected the contention that Mr. Futterman misled any of the other investors about these matters.

Instead, the arbitrator found there was just a disagreement over the extent of the company's liabilities for the relevant fees.

The arbitrator also rejected many other allegations of wrongdoing. He rejected contentions that Mr. Futterman and his managing entities had kept inaccurate records; that they had failed to cooperate with an audit; that RGS had allegedly converted business opportunities that should have belonged to 2280 FDB; that Mr. Futterman or RGS had made fraudulent statements to secure other investors' consents to financings; that RGS had improperly received brokerage commissions upon the sale of condominium units; that RGS had allegedly converted two of the membership interests in SoHa Terrace that were owned by USHA; and that RGS had falsified books and records related to the project.

On the other hand, the arbitrator did find that Mr. Futterman and RGS had deliberately postponed the sale of some condominium units with the goal of buying out the other investors at a discount. The arbitrator found that Mr. Futterman, through RGS, purposely withheld the leasing or sale of commercial units and residential units "so as to depress the income" to SoHa Terrace and "in order to frustrate the investors" so that they would sell their membership interests at a reduced rate. The arbitrator further found that this constituted self-dealing by RGS and Mr. Futterman, in that it represented an effort to benefit RGS by forcing the minority investors to sell at a depressed price.

Furthermore, the arbitrator found that Mr. Futterman, through RGS, had used the assets of SoHa Terrace, LLC "for his own personal benefit with no benefit to SOHA and its other members, including USHA." More particularly, he found that Mr. Futterman and RGS had caused SoHa Terrace to guarantee a loan that was made to RGS. The arbitrator held that using SoHa Terrace to guarantee the obligations of RGS was clearly a violation of RGS's duties as the

managing member, and that this of itself was "substantial cause to remove RGS, including Futterman, as the managing member of SOHA."

Finally, the arbitrator also found that Mr. Futterman had caused SoHa Terrace to pay expenses from a 2280 account in connection with a personal loan that Mr. Futterman had incurred.

As I noted above, the arbitrator decided that Mr. Futterman and RGS needed to be removed as managing member of SoHa Terrace. In addition, in light of the "intentional misconduct" described above, the arbitrator held that SoHa Terrace Manager Corp. also needed to be removed as the managing member of 2280 FDB.

At the hearing in this court, counsel to Mr. Futterman stated that Mr. Futterman disputes these findings. However, in his own motion to this Court Mr. Futterman has only taken issue with the remedy ordered by the arbitrator, and not with the underlying findings themselves. In fact, he has asked me to confirm the portions of the arbitrator's rulings in which those findings are set forth. There is no contention before me that Mr. Futterman and his entities did not have a full and fair opportunity to litigate the relevant issues. There is no contention that the arbitrator acted arbitrarily or capriciously in making the findings that he made. It is quite apparent from reading the arbitration decision that there would be no basis for such challenges.

There are questions that have been raised about the remedy ordered by the arbitrator, and I will get to those questions in a few moments. However, findings that were made in the arbitration and that have not been challenged are adverse to Mr. Futterman and are binding on him. They establish that Mr. Futterman, while acting in a fiduciary capacity, engaged in deliberate abuses of his authority for the purpose of injuring the persons whose interests he was

obligated to protect.  They also establish that he misused assets of the relevant entities for his

personal purposes in violation of fiduciary standards.

These findings constitute more than clear and convincing evidence of wrongful behavior.

In fact, as I mentioned, they are binding and not subject to further dispute.

In this chapter 11 case, Mr. Futterman is the debtor.  The various businesses that he owns

are not debtors, and they are not subject to the restrictions of the Bankruptcy Code in terms of

their operations and reporting obligations.  RWN has expressed concern that if Mr. Futterman

continues to be free to manage these businesses and their finances, there will be opportunities for

abuses similar to those that occurred in connection with the 2280 property.  It points out, for

example, that at the 341 meeting, Mr. Futterman revealed that the Jenco entity has received

payments for the use of its property by an adjoining land owner.  Jenco is a guarantor of RWN's

claims.  It is true that Mr. Futterman disputes whether RWN properly has a deficiency claim;

however, Jenco ought not to be disposing of collateral, and the proceeds thereof, unless and until

there is a final resolution of the merits of RWN's claim.  Yet that is apparently exactly what

Jenco did.  The correspondence that has been submitted to the Court suggests that Jenco

distributed the funds to affiliates  - the exact use is not clear -- and took the position that Jenco

was not subject to any restrictions because of the pending dispute as to the legitimacy of the

RWN guarantee claim.

The point of bankruptcy is to marshal assets in a way that maximizes their value for the

benefit, primarily, of creditors, and then once creditors are paid, for owners.  When a debtor

remains in possession of his businesses and properties in a chapter 11 case, he does so as a

fiduciary for those creditors.

The findings made by the arbitrator make clear that Mr. Futterman has abused such positions in the past and that he cannot be entrusted with those responsibilities in these cases.  It is plain, too, that Mr. Futterman does not have the confidence of his main creditors. Mr. Futterman disputes the validity of RWN's claim, but he acknowledges that it is the largest claim against him and that it is the reason, in fact, for the bankruptcy filing.  RWN plainly does not have confidence in Mr. Futterman, and has moved for the appointment of a trustee.  The investors in the 2280 project still have other claims they wish to pursue against Mr. Futterman that were not resolved in the arbitration.  They have not joined in the trustee motion, but their own lack of confidence in the fairness and independence of Mr. Futterman is evident in the fact that they took steps through the arbitration to bar him from exercising control of 2280 FDB and SoHa Terrace, based on allegations of intentional wrongdoing.

I find that these facts, taken together, constitute cause for the appointment of a trustee under section 1104(a)(1) or alternatively that they constitute reasons why the appointment of a trustee is in the best interests of creditors under section 1104(a)(2).  I cannot leave Mr. Futterman in charge of his businesses unless I have confidence that he will abide by the fiduciary obligations that he would owe.  The findings made by the arbitrator and the evidence submitted in connection with the Jenco payments preclude such confidence and require that a trustee be appointed to ensure that creditor interests are protected.

An independent, objective party is also needed to take charge of the many disputes between Mr. Futterman and his creditors over their claims and hopefully to resolve those claims.

I should note for the record that RWN made other contentions in support of its motion that I did not find convincing.  RWN contended that Mr. Futterman should not be entrusted with fiduciary duties because he failed in his initial disclosures to make a full disclosure of the

identities of all the entities in which he owned a majority or controlling interest. I have reviewed the schedules and I have reviewed the transcript of the meeting of creditors under section 341 of the Bankruptcy Code. It is clear to me that Mr. Futterman was not trying to hide anything. He made full disclosure at the 341 meeting and openly acknowledged instances where there were inadvertent omissions in the original schedules. There is nothing about the alleged errors or deficiencies in the schedules that themselves would warrant the appointment of a trustee.

RWN also contended that Mr. Futterman showed, during the Ladera cases, that he could not be trusted to share information or to proceed in an organized or logical course. It is true that there is and was a lot of bad blood between Mr. Futterman and RWN, as well as between Mr. Futterman and the other investors in the 2280 project. It is not sufficiently clear to me who was responsible for that bad blood, to be honest. There are aspects of both Mr. Futterman's and RWN's behavior, during the Ladera case, that could reasonably be criticized. Standing alone, these incidents and resentments would not be enough to warrant the appointment of a trustee in this case.

RWN also contended that Mr. Futterman has conflicts of interest because his parents are creditors. Debtors often owe obligations to affiliates in the case of companies, or to family members in the case of individuals. I do not find that this by itself would have warranted the appointment of a trustee.

I will now turn to the competing motions regarding the arbitration award.

USHA asks me to confirm the arbitration award in its entirety. Mr. Futterman and his entities argue that some parts of the decision and award should be confirmed, but that in certain respects, the arbitrator exceeded his authority and acted contrary to law.

The parties' dispute focuses on paragraphs 1 and 2 of the arbitration award. Paragraph 1 removes RGS, Mr. Futterman, and their affiliates from management and control over SoHa Terrace and 2280 FDB. Paragraph 2 states that USHA shall elect new managing members for SoHa Terrace and for 2280 FDB.

Mr. Futterman contends that this latter ruling is in violation of the terms of section 402(a) of the New York Limited Liability Company Law. More particularly, he argues that the SoHa Terrace operating agreement contains provisions that permit the removal of a managing member, but contain no provisions that describe how a new managing member is to be selected. He further contends that under these circumstances the election of a new manager must occur pursuant to section 402(a) of the New York Limited Liability Company Law, which provides that each member is entitled to vote in proportion to its economic stake in the LLC.

This dispute, and the separate disputes that I will discuss below as to section 703 of the New York Limited Liability Company Law, all relate to the question of who will manage the sale of the remaining units owned by 2280 FDB and the final accountings for the members of 2280 and the members of SoHa Terrace.

It seems quite plain to me that the members of these entities are at loggerheads and have been swept up in a vortex of distrust and dispute that threatens to consume not only time that could be more profitably spent, but also the values of some of the assets that could otherwise be distributed to the members of those entities.

I had hoped, as a result, that some sort of common sense would prevail and that the parties could reach agreement that someone whose independence and competence they all trust would be put in charge of these entities, but apparently that has not happened and I am left to decide the various motions.

16

I have reviewed the arbitrator's decision and the limited liability company operating agreements for SoHa Terrace and 2280 FDB. The SoHa Terrace operating agreement provides in section 1.32 that RGS is to be the managing member. Section 7.2 further provides that the managing member will continue to serve in that capacity until its dissociation as a member or until its removal as managing member pursuant to section 7.7. Section 7.7 of the SoHa Terrace operating agreement states that the managing member may be removed from that capacity in the event of a breach of the standard of care set forth in section 7.6. Section 7.6, in turn, states that the manager will be in breach of the care owed to other members if it engages in grossly negligent or reckless conduct, intentional misconduct, fraud, or a knowing violation of law.

I will pause here to note that it seems quite clear that the arbitrator had authority under section 7.7 to rule that RGS should be removed as the managing member of SoHa Terrace. But while the operating agreement permits this outcome, Mr. Futterman is correct in his contention that the operating agreement contains no provisions that specify how a replacement manager is to be selected. Mr. Futterman says that under section 402(a) of the New York Limited Liability Company Law RGS is entitled to a continuing role in the selection of a manager even if RGS itself can no longer be the manager and urges me to find that any action that deprives RGS itself of a continued say in the selection of a manager constitutes an action that is contrary to New York law.

USHA urges that I interpret the award as not only ensuring that Mr. Futterman would no longer control the entities but also as giving USHA the permanent right to designate the managers of SoHa and of 2280 FDB, no matter who else has interests in SoHa or who controls those interests. USHA also argues that I can only either confirm the entirety of the arbitration award or affirm none of it.

I do not accept either of those propositions, primarily because I find that it is not clear

exactly what the arbitrator intended, particularly in light of the developments that we presently

have.  For example, USHA contends that the arbitrator intended to give USHA itself the power,

permanently and on its own, to decide who the managers of SoHa Terrace will be.  That is a very

troublesome interpretation of the award.  For one thing, there is another owner of SoHa Terrace

in addition to USHA and RGS -- that is, Ventures.

Ventures may not be a voting member for ordinary purposes, but in the absence of a

competing provision of the limited liability company agreement, that would bring into effect

section 402(a) of the New York Limited Liability Company Law, and Ventures, as the owner of

economic interest, would have, ordinarily, a voice in the selection of the manager.  If I were to

interpret the arbitrator's award in the manner USHA urges, it would literally have the effect of

disenfranchising Ventures and taking away rights Ventures might otherwise have under

section 402(a) of the statute, even though Ventures was not a party to the arbitration, as I

understand it, and certainly was never accused of any wrongdoing.

In addition, it is one thing to remove Mr. Futterman from control in light of his prior

conduct.  In this bankruptcy case, however, Mr. Futterman will no longer have control of RGS,

as for the reasons cited above I have decided to appoint an independent trustee.

USHA argues that the arbitrator intended to permanently disenfranchise RGS, no matter

who was in control of RGS and no matter whether that person has any connection or

responsibility for the prior wrongful behavior of Mr. Futterman.  But the award was based on

Mr. Futterman's conduct.  It is certainly not clear to me that the arbitrator intended to

permanently disenfranchise RGS even if an independent trustee were in control of RGS, or on

what basis he intended to make such a ruling.

18

I note, too, that the award permits USHA to pick a new managing member for 2280 FDB. Technically USHA does not own an interest in 2280 FDB. The owners are SoHa Terrace and SoHa Terrace Manager Corporation. It may be the case, if the members of SoHa Terrace were to pick the manager of SoHa Terrace, that the manager of SoHa Terrace would then pick a manager of 2280. But giving that right directly to USHA cannot literally be what the arbitrator intended. It may be the practical consequence of how the arbitrator thought things would work, but it cannot literally be the proper way of describing for 2280 how a manager of 2280 will be selected.

I suspect that the arbitrator intended to bar Mr. Futterman from managing the entities. That much is clear. I suspect that he also intended to bar him personally from having a voice in selecting the replacement manager, contrary to what Mr. Futterman may now contend. And it is not clear to me that if the arbitrator just wanted to bar Mr. Futterman personally from having a voice in the selection of a replacement, that there would have been anything wrong with that, in light of the findings that the arbitrator made.

But in light of the fact that I have now appointed a trustee, it is not at all clear to me that the arbitrator intended or that there would have been a basis for him to hold that the trustee in control of RGS could have no say in the selection of a manager of SoHa Terrace, even though RGS plainly owns the eighty percent economic interest in SoHa Terrace, and even though section 402(a) of the New York Limited Liability Company Law says that in the absence of a contrary provision, the owners of those economic interests should have a vote in picking the manager.

I have the authority, where appropriate, to ask an arbitrator to clarify a remedy that the arbitrator has ordered. *See Hardy v. Walsh Manning Securities, L.L.C.*, 341 F.3d 126, 130,

134(2d Cir. 2003). I find it is appropriate to exercise that authority here. It is particularly

appropriate, before considering arguments as to whether the arbitrator made rulings that would

be contrary to law and in excess of his authority, that I first find out if the arbitrator actually

intended to do what he is accused of doing. I am not going to accuse an arbitrator, or even

consider accusations that the arbitrator went out of bounds, if the arbitrator himself did not intend

to do what the parties argue that he did.

I would therefore like the arbitrator to clarify the award in the following respects:

1) Did the arbitrator intend that USHA would have the permanent right to elect a

managing member of SoHa Terrace, and that the provisions of section 402(a) of the New York

Liability Company Law would not apply.

2) If the relevant provisions of the New York Limited Liability Company Law do apply

to the selection of a new manager, did the arbitrator intend to rule that RGS would not be entitled

to vote for the selection of a new manager, even if RGS is under the control of a trustee and not

under the control of Mr. Futterman?

3) Did the arbitrator intend to rule that USHA itself would have the right to name a

managing member of 2280 FDB, or does that right continue to belong to SoHa Terrace, as the

holder of 99.5 percent of the membership interests in 2280 FDB, LLC?

When this bench decision is finalized and an order is entered, I will ask the parties to

transmit the bench decision and the order to the arbitrator for purposes of obtaining the desired

clarifications on these particular points. To be very clear, I am not asking the parties to reopen

the arbitration or to assert new claims or to brief new positions about new requests for new

remedies. I just want the arbitrator to clarify what he has ordered and the scope of the rulings he

has already made in light of where we now find ourselves.

I do not think the arbitrator needs anything other than this decision and my order in order to provide that clarification, although obviously, if the arbitrator himself thinks that he needs further guidance as to just what I am looking for, the arbitrator can say so.

On a separate note, USHA has argued that none of this is going to make any difference because in its view, RGS, if controlled by a trustee, could never have any say in voting for a replacement manager. USHA points to section 11.9 of the SoHa Terrace limited liability company operating agreement, which states that "neither the managing member or Hans Futterman shall be permitted to transfer, hypothecate, or pledge any interest in RGS Holdings, LLC, and Hans Futterman shall be required to remain as managing member of RGS Holdings, LLC, which shall be the managing member of the Company."

It certainly makes sense that the parties wanted to know who would manage RGS to the extent that RGS itself was to be the managing member of SoHa Terrace. That is what section 11.9 says. However, USHA itself instituted an arbitration for the purpose of removing both Mr. Futterman and RGS from any positions of management and control with respect to SoHa Terrace. There is nothing in the agreement that says that RGS loses its other rights as a member of SoHa Terrace, in the event that Mr. Futterman is no longer the managing member of RGS. Similarly, if the managing member is removed and if a new manager is to be elected under New York law, there is nothing in the agreement that says that RGS, as the owner of economic interests, cannot vote with respect to the selection of a new manager. I note in this regard that in the absence of a contrary provision in the limited liability company agreement, the New York law gives voting rights to parties in accordance with their economic interests, and RGS's continuing economic interest is undisputed. So I do not think the clarifications being requested are meaningless in any respect.

21

I will now turn to the motions for the appointment of an independent manager or a liquidator or receiver under New York law.  As noted above, Mr. Futterman has also asked that I appoint an independent manager of 2280 FDB, LLC.  Originally, it appears that the request was limited to 2280, but in reply papers, the request was broadened to include SoHa Terrace.

At the hearing, the debtor argued that I somehow could invoke the Court's powers under section 105 of the Bankruptcy Code to accomplish this result.  That argument is without merit.  Section 105 of the Bankruptcy Code permits a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this Title." 11 U.S.C. § 105(a).  Section 105 merely allows the Court to issue orders that will implement relief the Bankruptcy Code allows the Court to grant.  *See generally Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) (confirming that as a general matter, "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.")  There is nothing in the Bankruptcy Code that purports to give me the power to designate the persons or entities who will exercise control over non-debtor entities in which a debtor has indirect ownership interests.

However, I asked the parties to make further submissions on the issue of whether I would have the power, in the context of the New York court litigations that had been removed to this Court, to appoint a liquidator or a receiver pursuant to the provisions of section 703 of the New York Limited Liability Company Law.  The parties have made their submissions and have made a host of arguments as to whether section 703 is applicable and whether I do or do not have any authority under its terms.

I will first discuss the extent to which section 703 permits the appointment of a trustee or a receiver, and then I will separately discuss the question of whether such an appointment is appropriate here.

USHA has argued, essentially, that section 703 only applies to the extent that a court has ordered a dissolution under section 702 of the New York Limited Liability Company Statute. Section 702 provides that "[o]n application by or for a member, the supreme court in the judicial district in which the office of the limited liability company is located may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement.  A certified copy of the order of dissolution shall be filed by the applicant with the department of state within thirty days of its issuance."

USHA argues that the remedy provided in section 702 is a drastic one and that under the case law it can only rarely be justified and invoked.  However, section 702 is not the only provision under which a limited liability company may be dissolved.  Sections 701(a)(2) and (a)(3) of the New York Limited Liability Company Law clearly state that a limited liability company is to be dissolved and its affairs wound up upon the happening of events specified in the operating agreement or upon the affirmative vote or written consent of a majority in interest of the members or such higher number as is required by the operating agreement.

Furthermore, it is clear that the Court's ability to appoint a receiver or a liquidating trustee is not limited to dissolutions that take place as a result of judicial order under section 702. By its terms, the first sentence of section 703(a) states that in the event of a dissolution, *except for* a dissolution under section 702, the members may wind up the affairs of the limited liability company.  This makes clear that section 703 covers dissolutions of all kinds, not just those under

section 702.  The second sentence of section 703(a) then states that for cause, and upon the

application of any member or his or her legal representative or assignee, the court may appoint a

receiver or a liquidating trustee.

We are aware of one decision stating that the appointment of a receiver under section 703

is not appropriate without a judicial dissolution order under section 702.  *See At the Airport v.*

*ISATA, LLC*, 856 N.Y.S. 2d 22 (Sup. Ct. 2007).  However, no explanation for that conclusion

was offered, and an earlier decision in the same case made clear that no dissolution of any kind

was in process under either sections 701 or 702.  On the other hand, we have found at least two

more recent cases in which New York courts either appointed a receiver under section 703 in the

context of a dissolution under section 701, or acknowledged the power of courts to do so.  *See*

*Naples v. Olin*, 887 N.Y.S. 2d 378, 379-80 (App. Div. 2009); *In re Fassa Corp.*, 924 N.Y.S. 2d

736, 739 (Sup. Ct. 2011).

In this case, section 13.1(b) of the operating agreement for SoHa Terrace provides quite

clearly that the company is to be dissolved "without further action by the Members," and "its

affairs wound up," upon the "written consent of the Members holding at least two-thirds of the

membership interests."  It is undisputed that RGS owns eighty percent of the membership

interest in SoHa Terrace and therefore owns more than two thirds.

Mr. Futterman has submitted evidence to the Court that articles of dissolution were filed

with respect to SoHa Terrace in 2016.  Those have been received in evidence, and they note that

the articles were being filed based on "[t]he vote or written consent of a majority in interest of

the members" of SoHa Terrace.

Dissolution therefore apparently has been invoked under the terms of the operating

agreement that is proper under section 701.  In such a dissolution, the Court may appoint a

liquidating trustee or a receiver, but it is not required to do so.

USHA argues that the dissolution action is non-effective, but its arguments are not

persuasive.  First, it argues that section 13.1(b) of the SoHa Terrace operating agreement requires

the vote of "members" holding at least two-thirds of the membership interests, which it believes

means that more than one member must vote for dissolution.  That argument is not persuasive.

Where the operating agreement required consent by all or by more than one member, it did so

explicitly.  Section 13.1(b) focuses on the membership interests that are voted in favor of

dissolution, not on the number of members who vote.

Second, USHA argues that under section 405 of the New York Limited Liability

Company Law, RGS was required to provide notice and to schedule a meeting to consider the

proposed dissolution.  This argument is belied by section 701 of the New York Limited Liability

Company Law, which makes clear that dissolution can occur by vote or by written consent.  It is

also belied by section 13 of the operating agreement, which says that dissolution can be provided

upon the "written consent" of the holder of two-thirds of the membership interests.

Third, USHA argues that other members should have been given notice of RGS's actions

under section 407 of the New York Liability Company Law.  Section 407 requires such notice to

members who fail to consent in writing "but who would have been entitled to vote thereon had

such action been taken at a meeting."  It is hard to understand here why notice was not given.

However, there is no argument that as a legal matter, the failure to give notice, after-the-fact,

somehow invalidates RGS's written consent, or why it should do so.

Fourth, USHA argues that Mr. Futterman and RGS were required to go through arbitration before exercising rights under section 13.1(b). However, there is no conceivable dispute about RGS's rights under section 13.1(b) that would call for arbitration. Section 13.1(b) does not impose any conditions to the exercise of a member's right to consent to dissolution, or impose any obligations to anyone else in connection with the exercise of that right.

USHA may not like it, but USHA does not have a general right to arbitrate every exercise of a party's clear rights just because USHA does not like the result. It has a right to arbitrate if there is a legitimate dispute as to the interpretation of the agreement or as to the conduct of the parties in the exercise of their duties. But here, there can be no legitimate dispute about the rights that are clearly set forth in section 13.1(b). USHA has no right to invoke arbitration as a tool to delay or to try to nullify the plain rights that are granted by section 13.1(b).

Today, USHA has argued that unanimous consent is required for dissolution under the terms of the operating agreement. But that plainly cannot be the case, because section 13.1(b) could not be clearer in stating that dissolution may occur upon the favorable vote of the holders of two-thirds of the outstanding membership interests. There is no basis on which I could hold or that anybody could hold that unanimous consent is required in light of the extremely explicit statement to the contrary in section 13.1(b).

Finally, USHA argues that dissolution would violate the terms of an injunction that Judge Ramos entered by consent in these cases on July 14th, 2017. However, it is quite evident that the dissolution actions were taken long before the injunction was issued. Furthermore, the injunction is now my injunction, in effect, as the cases have been removed to me. In that regard, the request that I appoint a liquidating trustee is, in my thinking, just a request for modification of the injunction and not a violation of the injunction itself.

26

It may well be that Mr. Futterman and RGS jumped the gun by filing actual articles of dissolution.  Section 13.4 of the operating agreement states that such articles are not to be filed until after the company has been wound up, although it does appear to contemplate a ninety-day wind-up period.  Plainly, the affairs of SoHa Terrace have not been wound up.  It had litigation that remained to be resolved, and it continues to own valuable property that has not been liquidated, namely its membership interest in 2280 FDB.

However, while the secrecy of all this is a mystery, and while some of the actions may not have been in compliance with the operating agreement, I see no reason why this should negate RGS's prior consent to a dissolution.

I had a separate question, frankly, as to whether the request for the appointment of a liquidating trustee or receiver under section 703 would properly be made in the context of the state court lawsuits that have been removed to this court or whether a new state court proceeding or even a special proceeding of some kind would be required.  However, none of the parties have contended that a separate state court proceeding would be required or that there is any state court procedural obstacle to my consideration of the issue in the context of the litigations that have been removed to this Court.

USHA has argued that that there would be a need to have discovery and a trial as to whether a judicial dissolution should be ordered.  But this is not a question of a judicial dissolution.  This is a plain issue of whether RGS did or did not exercise the rights that are given to it under section 13.1(b), and there is no dispute that it did.  USHA has also argued that there would be a need for discovery and a trial as to whether "cause" exists for the appointment of a trustee.  I will address in a moment my thoughts as to whether "cause" exists and whether further proceedings would be needed to decide that issue.

27

Finally, the parties have differed with each other as to the merits of the request for appointment of a liquidating trustee or a receiver, but as I noted, nobody has objected or taken the position that that request has to be made in a new lawsuit.

As to 2280 FDB, the conclusion is somewhat different.  Section 10.1 of the limited liability company agreement states that the company "shall be dissolved" upon the happening of various events.  One of those events, set forth in subpart 10.1(c) of the limited liability company agreement, is the affirmative vote of the members holding a majority of the Class B units.

There is no dispute that SoHa Terrace Manager Corp. owns all of the Class B units.  It appears that SoHa Terrace Manager Corp. could exercise rights, as the owner of all of the Class B units, to demand a dissolution of 2280 FDB.  In that event, section 10.2(a) of the limited liability company agreement for 2280 FDB would require the manager to sell or otherwise liquidate all of the company's assets as promptly as practicable, except to the extent that assets might be distributed in kind.

However, I have no evidence that section 10.1(c) of the limited liability company has been invoked and I do not have a formal request for judicial dissolution under section 702.  I also agree that if a request were made under section 702, further proceedings would be needed in order to resolve disputes as to whether judicial dissolution of 2280 FDB  were to be warranted.

I therefore find I have no authority or justification for the direct appointment of a trustee or receiver for 2280 FDB, LLC.  That leaves me to decide the merits of the request as to SoHa Terrace.

Section 703 states that, for cause shown, the court may wind up the affairs of an LLC that is in dissolution and in connection therewith may appoint a liquidating trustee or a receiver. Courts have found cause where parties could not agree on fundamental matters regarding the

operation of a company, including the refinancing of debts, and were suing each other over alleged financial improprieties.  In fact, courts have found those are grounds for the judicial dissolution of a limited liability company.  *See, e.g.*, *Fakiris v. Gusmar Enterprises, LLC*, 48 N.Y.S. 3d 265(Sup. Ct. 2016).

However, the appointment of a receiver or a liquidating trustee is not mandatory, even if a dissolution has been invoked.  I believe the better course, at this point, would be to wait until a trustee has been appointed in Mr. Futterman's bankruptcy case, and until a trustee has taken charge of RGS and the other entities, in order to determine how the trustee wishes to manage those entities' properties and what relief the trustee wishes to pursue as to those entities.

Perhaps the trustee would prefer that SoHa Terrace continue to operate.  It might reach agreement with USHA and others to that effect.  Perhaps the trustee would choose to invoke rights through SMO and then, through SoHa Terrace Manager Corp., to demand a dissolution and liquidation of 2280 itself.  Perhaps he would have other courses of action he would prefer to take.  Having decided that a trustee should be appointed to take over Mr. Futterman's properties and businesses, I do not think it would be prudent to make a final decision today about the appointment of a receiver or a liquidating trustee for SoHa Terrace or 2280, based on Mr. Futterman's requests, and that it would be better to see how the trustee wishes to proceed on those points.

It bears repeating that it seems quite clear to me that the members have dissolution rights that could be invoked and that there are intractable disputes here that may well justify the appointment of a liquidating trustee or a receiver, if the trustee were to make such an application. However, I continue to hold out hope that the other members of SoHa Terrace ought to be able to reach reasonable agreements with the trustee as to the management and affairs of those entities,

and I will not foreclose that possibility by appointing a third-party liquidator or receiver at this time.

The remaining matter that is pending is the motion for summary judgment in the removed RWN action and the objection to the claim. It is plain that the RWN claim is driving much of what is happening in these cases and potentially affects many of the relevant entities and needs to be resolved promptly. We will enter a scheduling order once a trustee has been appointed and has had the chance to be heard on the schedule.

Dated:  New York, New York
        May 9, 2018


                                    **/s/Michael E. Wiles**
                                    THE HONORABLE MICHAEL E. WILES
                                    UNITED STATES BANKRUPTCY JUDGE